IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                )
UNITED STATES OF AMERICA,        )
                                 )
                                 )  DOCKET NO. 3:15-CR-222
            vs.                  )
                                 )
CHRISTOPHER JAMES BARKER,        )
                                 )
            Defendant.           )
_____ )


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE FRANK D. WHITNEY
UNITED STATES CHIEF DISTRICT COURT JUDGE
TUESDAY, JANUARY 19, 2016 AT 2:00 P.M.


APPEARANCES:

On Behalf of the Government:

        MICHAEL E. SAVAGE, ASSISTANT U.S. ATTORNEY
        U.S. Attorney's Office
        227 W. Trade Street, Suite 1650
        Charlotte, North Carolina  28202


On Behalf of the Defendant:

        RICHARD EUGENE BEAM, JR., ESQ.
        Law Offices of Richard Beam
        P.O. Box 2401
        262 W. Main Avenue
        Gastonia, North Carolina  28053




        JILLIAN M. TURNER, RMR, CRR, CLR
            Official Court Reporter
         United States District Court
          Charlotte, North Carolina

```
 1    (Tuesday, January 19, 2016 at 2:00 p.m.)
 2                    P R O C E E D I N G S
 3         (Counsel and defendant present.)
 4         THE COURT:  Good afternoon.
 5         THE COURTROOM AUDIENCE:  Good afternoon.
 6         THE COURT:  We're here in United States v.
 7    Christopher James Barker for Mr. Barker's sentencing.  It's
 8    case 3:15-CR-222.  Mr. Beam is here on behalf of the
 9    defendant, and Mr. Savage is here on behalf of the United
10    States.
11         Mr. Barker, would you please stand.
12         Mr. Barker, do you recall appearing before
13    Magistrate Judge David Cayer on September 28 of 2015 for the
14    purpose of entering a plea of guilty?
15         THE DEFENDANT:  Yes, sir, I do.
16         THE COURT:  Do you remember being put under oath at
17    that time?
18         THE DEFENDANT:  Yes, sir.
19         THE COURT:  Do you remember answering a series of
20    questions of Judge Cayer?
21         THE DEFENDANT:  Yes, sir.
22         THE COURT:  Were all your answers to all of his
23    questions true and correct?
24         THE DEFENDANT:  Yes, sir, they were.
25         THE COURT:  If I were to ask you those same
```

1    questions today, would your answers be the same?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And on that day you were asked to

4    review an electronic document known as Acceptance of Plea

5    Form.  That document lists all the questions that the judge

6    asked you during the course of the hearing.  As you answer

7    each question, he checks off your answer.  At end of the

8    hearing you're asked to review his checks to make sure he

9    accurately checked off the right box and you're asked to sign

10    it.

11          Did you review the document for accuracy and did

12    you sign it?

13          THE DEFENDANT:  Yes, sir, I did, and I did sign.

14          THE COURT:  Thank you, sir.

15          Mr. Beam, were you present at that Rule 11 hearing?

16          MR. BEAM:  I was, Your Honor.

17          THE COURT:  Do you believe Mr. Barker fully

18    understood Judge Cayer's questions?

19          MR. BEAM:  Yes, sir, I do.

20          THE COURT:  Thank you.  Mr. Barker, one last

21    question.  It's the most important question that I'll ask you

22    today.  On September 28 of 2015, you admitted to Judge David

23    Cayer that you were guilty of two federal felonies.  One of

24    those was conspiracy to defraud the United States; the other

25    was possession of ammunition by a prohibited person.

1          Now, I ask you again this afternoon are you, in

2     fact, guilty of those two federal felonies?

3          THE DEFENDANT:  Yes, sir, I am.

4          THE COURT:  Thank you, sir.

5          Based upon those representations and the answers

6     given by the defendant at the Rule 11 hearing before

7     Magistrate Judge Cayer, the Court affirms the magistrate

8     judge's findings that the defendant's plea was -- pleas were

9     knowingly and voluntarily made, and that defendant fully

10    understood the charges, potential penalties, and consequences

11    of his two pleas of guilty.  Accordingly, the Court affirms

12    the magistrate judge's acceptance of the defendant's plea of

13    guilty at the Rule 11 hearing.

14         Now, this Court independent of the magistrate

15    judge, after reviewing the record in this case, including the

16    Rule 11 colloquy, also finds as a matter of fact that

17    defendant's plea was knowingly and voluntarily made, and that

18    the defendant fully understood the charges, potential

19    penalties, and consequences of his pleas.  Accordingly, this

20    Court accepts the defendant's two pleas of guilty at the

21    Rule 11 hearing, and this Court hereby adjudicates the

22    defendant guilty of the two crimes of the conspiracy to

23    defraud the United States in violation of Title 18, U.S.

24    Code, Section 371, and possession of ammunition by a

25    prohibited person in violation of Title 18, U.S. Code,

1    Section 922(g).

2            Now, the parties entered into a written factual

3    basis.  That written factual basis is found -- is Document

4    No. 30 in the Electronic Case File and was adopted as the

5    offense conduct for the presentence report.  The magistrate

6    judge relied on this written factual basis as well as the

7    defendant's admissions to find there was a factual basis for

8    the entry of the two pleas.  This Court affirms the

9    magistrate judge or the judge's finding there was a factual

10   basis, and this Court independently finds based on the

11   written factual basis and the defendant's admissions before

12   this Court that there's a factual basis for the entry of the

13   two pleas of guilty.

14           Now, Mr. Barker, after you entered your two pleas

15   of guilty, your case was referred to the United States

16   Probation Office for a presentence investigation report.  I'm

17   holding a copy of that report up.

18           Have you received a copy of this report?

19           THE DEFENDANT:  Yes, sir, I have.

20           THE COURT:  Have you read it?

21           THE DEFENDANT:  I have.  Yes, sir.

22           THE COURT:  Do you understand it?

23           THE DEFENDANT:  I do.

24           THE COURT:  And have you had an opportunity to go

25   over the report with Mr. Beam?

1          THE DEFENDANT:  Yes, sir, I have.

2          THE COURT:  And has he answered any and all

3    questions you have regarding the report?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  All right.  Thank you.

6          There are pending objections or at least one

7    pending objection.  Is that objection still ripe since the

8    Government's filed a motion?

9          MR. SAVAGE:  Yes, Your Honor.  I think that that

10   would -- you would need to decide that and make findings for

11   that in order to decide where the departure should begin.

12         THE COURT:  All right.  All right.  The defendant

13   objects to the base offense level 22 because the large

14   capacity magazine in the defendant's possession was not

15   allegedly in close proximity to the firearm involved in the

16   instant offense since the firearm was never actually

17   possessed by the defendant.

18         I will hear argument from Mr. Beam as to why his

19   objection should be sustained.

20         MR. BEAM:  Your Honor, as the Court was just

21   quoting from the Commentary No. 2 to 2K2.1, that -- the

22   commentary says what it says, which is that the magazine must

23   be in close proximity to the firearm.  Here, there was no

24   firearm in the residence.  My client did have the clip, but

25   the firearm -- that gets into the issue of I think the first

1 count that we entered the plea to as to how the Court deems

2 as to the time of the offense. I understand the Government

3 has some evidence on that, and quite frankly, I think it

4 would be better for them to talk about that, and we'll

5 address the legal issue with the Court's permission.

6 THE COURT: All right. If the Government is

7 intending to present evidence, then we'll proceed.

8 MR. SAVAGE: Yes, Your Honor, and I'll proceed by

9 way of proffer. I have agents if the defense wishes to

10 cross-examine them, but I think it's a pretty simple issue.

11 Your Honor, one of the charges here is conspiracy.

12 The conspiracy was thwarted, as shown from the presentence

13 report. When the defendant went -- the defendant's

14 accomplice, Mr. Litteral went to the Gander Mountain store in

15 Gastonia, North Carolina, to purchase a Model MP-15

16 Smith & Wesson assault rifle on behalf of Mr. Barker, who at

17 the time had a felony conviction that made him a prohibited

18 person.

19 As the Court is aware, there was a court ordered

20 electronic surveillance in which phone conversations between

21 the defendant and Mr. Barker could be overheard in which it

22 was absolutely clear Mr. Barker knew -- Mr. Litteral knew

23 that Mr. Barker was a prohibited person.

24 THE COURT: Am I permitted to consider the T3

25 record?

1       MR. SAVAGE:  Well, I think you can, Your Honor.

2       THE COURT:  Without you separately introducing it.

3  You can separately introduce it.

4       MR. SAVAGE:  Yes, Your Honor, we can.  But I think

5  the factual basis that is in -- that is in the presentence

6  report lays this out in paragraph 9.  You can certainly

7  consider that.  And it's just by way of background to inform

8  the Court as is present as the presentence report notes.  If

9  I can find that.  I refer the Court to paragraph 9.

10      THE COURT:  That's in your motion too, isn't it?

11 Or in your opposition to the objection?

12      MR. SAVAGE:  Yes, Your Honor.

13      So paragraph 9 are the facts we'd like the Court to

14 consider; and that is, the conspiracy wasn't completed only

15 because the Government intervened.  During the time -- and

16 give the Court some background.

17      Obviously, the Court's aware that in order to buy a

18 gun in this country, you have to have a background check.

19 The FBI was aware that the transaction was taking place.  It

20 was aware that Mr. Barker if he had received the gun would

21 have been an intended purpose and, therefore, acted to

22 prevent the gun from being delivered.

23      So under 2X1.1, which is the conspiracy guideline.

24      THE COURT:  Right.

25      MR. SAVAGE:  That would apply.  And all these

special characteristics under the underlying offense should apply. And there is no deduction if it appears that everything was done -- everything could have been done by the defendants was done but for an intervening act that prevented the completion of the offense.

So at the time that Mr. Litteral went to the -- went to the Gander Mountain store -- I have two exhibits, Your Honor, one of them which is attached. And I'll mark the weapon as Government's Exhibit 1.

The actual weapon that was purchased had a specific serial number. Mr. Litteral filled out a form, which is the ATF form, and had that serial number on it. He goes to the counter, and he has the box with the particular weapon in it. And I have marked that as Government's Exhibit No. 1.

If I could approach, Your Honor? The box has in it --

THE COURT: I'm going to come down and join you. I don't have enough room up here.

MR. SAVAGE: Has in it not only the weapon, but a magazine, which is an MPM Mag 30 ar/m4 magazine.

THE COURT: Mr. Beam, do you dispute that at the purchase at Gander Mountain the magazine was in the box? Are you disputing that?

MR. BEAM: No, sir. I don't think we have any evidence to the contrary.

1          MR. SAVAGE:  Okay.  And, Your Honor, I might also
2     show you what's been marked as Government's Exhibit 2, which
3     is the description of this item, which clearly shows that the
4     gun comes with the weapon, a stock, a magazine, and a lock.
5          THE COURT:  Is this the actual weapon, or is this
6     for demonstration?
7          MR. SAVAGE:  No.  This is the actual weapon.  It
8     has the same serial number as the --
9          THE COURT:  There was one thing I saw in your
10    pleading that actually is actually incorrect.  It says
11    inoperable without the magazine.  I think you can fire one
12    round without the magazine.
13         MR. SAVAGE:  Well, that being --
14         THE COURT:  Is there an ATF expert in here?
15         MR. SAVAGE:  No, I don't.
16         MR. BEAM:  The Court is correct there.
17         THE COURT:  You can load -- you can load one round
18    at a time and it loses its semi-automatic capability.
19    Semi-automatic is when it --
20         MR. SAVAGE:  Well, I stand corrected on that, Your
21    Honor.
22         THE COURT:  Thank you.
23         MR. SAVAGE:  We have other people that do that for
24    us.
25         THE COURT:  Exactly.

1          MR. SAVAGE:  So, Your Honor, at this time we would

2     move for admission of Government's Exhibits 1 and 2 as

3     Government's response -- part of Government's response to the

4     motion.

5          THE COURT:  Any objection?

6          MR. BEAM:  No, sir.

7          THE COURT:  All right.  1 and 2 will be admitted.

8          (Government's Exhibits Nos. 1 and 2 were received

9     into evidence.)

10          MR. SAVAGE:  Okay.  And, Your Honor, even if --

11     even if that were not the case and they weren't together at

12     the same time, the Court could still find that the guns were

13     in proximity to each other because it was an intended

14     offense.

15          I think much like the Court would remember the

16     Fourth Circuit's ruling in *Kazai* (phonetic), that as long as

17     the Court makes findings with regards to what was intended at

18     the time.

19          I think that it is fairly obvious from the evidence

20     in the presentence report, without even further evidence,

21     that on the very same day in which Mr. Litteral and

22     Mr. Barker are planning to buy the gun, they discuss buying

23     100 rounds, which I have here, of ammunition and another

24     30-round magazine.  And at some point in time had the gun --

25     the -- had the crime not been thwarted, Mr. Litteral intended

1  to deliver that to Mr. Barker, where it would have been in

2  the same place as the magazine and the bullets, which were in

3  the dresser drawer of Mr. Barker's house when he agreed to a

4  search of that house on August 1st, 2015.

5          So for those reasons, Your Honor, we think that the

6  Court should make findings and overrule the defendant's

7  objections.

8          THE COURT:  All right.  Mr. Beam, of that, any part

9  of that proffer you disagree with?

10          MR. BEAM:  No, sir.

11          THE COURT:  All right.

12          MR. BEAM:  That was my understanding of what the

13  evidence was also.

14          THE COURT:  All right.  There appears to be no

15  dispute as to the evidence.  There's a dispute as to the

16  interpretation of in close proximity to the firearm --

17          MR. BEAM:  Correct.

18          THE COURT:  -- under 2K2.1, Comment Note 2.

19          So I'll hear argument, Mr. Beam.

20          MR. BEAM:  Well, Your Honor, you've summarized it

21  fairly accurately.  It's a question of how you interpret it.

22  Clearly, the magazine that Mr. Barker had was not in close

23  proximity to the weapon.  The weapon never arrived at his

24  residence.

25          THE COURT:  But -- but the weapon and the magazine

1    were in the same box at the moment of purchase, correct?

2              MR. BEAM:  Well, I -- I -- I would assume so.  Yes,

3    sir.  I know the magazine comes with the firearm.

4              THE COURT:  Right.  Well, Exhibit 2 does list the

5    magazine --

6              MR. BEAM:  Yes, sir.

7              THE COURT:  -- as part of the items that

8    collectively purchased in that box.

9              MR. BEAM:  Correct.

10             THE COURT:  Okay.

11             MR. BEAM:  So it's a question of whether the Court

12   applies it as the purchase of the firearm or whether you look

13   at how the situation was at the time the search was actually

14   executed.

15             THE COURT:  All right.  So as to the conspiracy,

16   though, are you agreeing that if we look at it from the

17   conspiracy perspective, not from the 922(g) perspective, that

18   the weapon was in close proximity to the -- or excuse me, the

19   other way around.  The ammunition or the magazine was in

20   close proximity to the firearm for the purposes of

21   conspiracy?

22             MR. BEAM:  For the purposes of the conspiracy, I

23   think that's what the evidence establishes.

24             THE COURT:  Right.

25             MR. BEAM:  Whether I like it or not, I think that's

1    what it established.

2             THE COURT:  Right.  Under 371, you have to identify

3    one overt act.  One overt act would be to purchase.

4             MR. BEAM:  Correct.  Yes, sir.

5             THE COURT:  It appears as a matter of law, because

6    there's no dispute the clip was in the box, that if the

7    conspiracy is the charge that we're talking about, then the

8    Government prevailed.

9             Now, let's go to the other charge, the 922(g), and

10   I'll hear argument on that.

11            MR. BEAM:  Well, the 922(g), Your Honor, I think

12   it's pretty clear that that issue is the possession of the

13   ammunition and the magazine.  That was never in close

14   proximity to the weapon regardless factually.

15            THE COURT:  The Government is arguing that it was

16   intended to be, and that is part of the underlying offense of

17   922(g), right?  That you're looking at -- well, not the

18   922(g), per se, but you're looking at what was intended of

19   the parties in the illegal possession of the ammunition.

20            Why is that wrong that you can't look at the intent

21   even if the weapons weren't close -- the weapon and the clip

22   are not close together at any given time?  They're intended

23   to be close together.

24            MR. BEAM:  I can only cite the Court to the

25   commentary.  If you have a weapon like this that uses a

1    magazine like that, I would say that any time you had

2    somebody in possession of that firearm, that would -- if you

3    looked at it, that would be the intent.  But that's not what

4    the commentary says.  It says the magazine has to be in close

5    proximity.  They could have certainly said that if that's

6    what they meant.  They said it had to be in close physical

7    proximity.  This is how they drafted the commentary, and I

8    don't think anybody disputes that there wasn't no close

9    physical proximity.  In other words, it seems to refer to it

10   more in the factual matter as in the intended matter.

11             THE COURT:  Mr. Savage, so for argument purposes,

12   let's assume that the Court can't use what's actually

13   intended for purposes of the Count Two, the 922(g).  Do I

14   need -- do I need to even address that since conspiracy --

15             MR. SAVAGE:  No, Your Honor.  I don't think you do.

16             THE COURT:  -- 2X1.1 attaches to -- to the

17   guidelines provision, the section that applies to 922(g)s?

18             MR. SAVAGE:  No, Your Honor.  I don't think you do.

19   We were, quite frankly, relying on Count One.  Although it's

20   not mandatory binding authority in this case, we cited one

21   case.  There hasn't been a lot of cases, which is *U.S. v.*

22   *Curruth,* which was decided in 2011 out of the Eighth Circuit

23   which had somewhat similar circumstances here except it

24   didn't have a conspiracy.  And what the Court found in that

25   case -- I think this Court needs to find the operable words

1  in Comment 2 are what is the time of the offense.  So we
2  think the time of the offense here is going to be the
3  conspiracy to purchase -- the straw purchase, the lie and
4  buy.

5              THE COURT:  So you're saying the time of the
6  substantive offense is the time of the whole scope of the
7  conspiracy?

8              MR. SAVAGE:  Yes, Your Honor.  And that begins
9  with --

10              THE COURT:  And that's true under wire fraud and
11 mail fraud.  It's an ongoing scheme.

12              MR. SAVAGE:  Right.

13              THE COURT:  I understand that.  Is that 922(g)?

14              MR. SAVAGE:  Well, it would be at least -- see, if
15 there was a conspiracy, if the -- if the Court looks at the
16 indictment in this case -- I'm sorry, the information, it
17 specifies what the dates are.  But more than that, it has --

18              THE COURT:  Doesn't a 922(g) begin and continue?

19              MR. SAVAGE:  Even after the conspiracy.

20              THE COURT:  Well -- well, how -- it begins when the
21 substantive count begins when an individual takes possession
22 of a firearm or ammunition when they're a prohibited person.
23 Doesn't it end when they are no longer possessing the firearm
24 or ammo?  How can it continue beyond that?

25              MR. SAVAGE:  Well, in the *Curruth* case, they noted

1    there was a time that the defendant in that particular case

2    accepted a box with ammunition with it.  And later on when

3    the search occurred, they searched the house and didn't find

4    any ammunition or any of the things that had to do with the

5    search.  They went back and said, well, if during the time of

6    the offense the defendant was -- was a convicted prohibited

7    person and he had received the firearm knowingly, then that

8    put him in proximity.  And as long as it meets the

9    requirements of 2K2.1, then at that point in time, the

10   defendant's responsible.

11          I go back to our particular case comparing that to

12   ours and look at the Count One of the conspiracy and it has

13   two objects.  One is to defraud the United States by

14   impairing and impeding the FBI in its regulation of firearms,

15   which includes in this case the fact that Mr. Litteral with

16   the conspiracy agreement of Mr. Barker went to do the lie and

17   buy and filled out the forms falsely and intended to receive

18   a gun to give to Mr. Barker in violation of all those things.

19          THE COURT:  Right.

20          MR. SAVAGE:  Then there are the substantive

21   violations which include 922(a)(6), 922(g)(1), and by the

22   way, 922(g)(3), because the evidence would show at the same

23   time as Mr. Barker was giving a gun to Mr. -- Mr. Litteral

24   was giving a gun to Mr. Barker, he was also giving him

25   prescription medication and he was addicted.

1    THE COURT:  Right.  The other -- the other bases
2  for a person being prohibited.  One of the many.
3    MR. SAVAGE:  For all of those reasons, he would
4  have been prohibited at the time of the conspirators intended
5  that he receive the gun.
6    But if the Court feels uncomfortable with that, it
7  can simply go with the fact at the time of the conspiracy of
8  the act -- the overt act here, which is the lie and buy at
9  Gander Mountain, that the box had the magazine in it at the
10  time and they're very closely together.  They don't have to
11  be ammunition in it.  It just has to have a magazine.
12    So if the Court finds at the time of the offense
13  begins with a conspiracy which is no later than March 1 and
14  continuing until no later than August 1, 2015, and during
15  that time one or more of the conspirators was in possession
16  of an AR-15 with a 30-round magazine in proximity to it, then
17  I think that satisfies the requirements of both 2K2.2 and by
18  analogy the cross-reference to the conspiracy guideline, and
19  also 2B1. -- is it 2B1.1, which requires that all relevant
20  conduct, the definition of offense be included in the Court's
21  consideration.
22    I think the Court merely needs to make findings as
23  to those things and that would sustain -- that would overrule
24  the defendant's objections.
25    THE COURT:  Let me ask the probation office.  I

1    believe the probation officer relied on the conspiracy

2    perspective view --

3           THE PROBATION OFFICER:  Yes.

4           THE COURT:  -- versus the actual intended view for

5    the substantive count?

6           THE PROBATION OFFICER:  Yes, Your Honor.

7           THE COURT:  All right.  And I'm comfortable, and I

8    believe it's legally correct what the probation has done, and

9    that is, to rely on the conspiracy theory.  The other might

10   be legally correct, but when I think one is -- is clear, I'm

11   going to rely on that, and I'm -- I find it unnecessary to

12   reach the other issue.

13          So the objection is overruled.  The Court believes

14   that the conspiracy, Section 371 of Title 18 uses the base

15   offense level of 22 from 2K2.1 because 2X1.1 directs the

16   conspiracy guideline to apply the base offense level from --

17   from the substantive offense.

18          MR. SAVAGE:  Your Honor, can I ask?  Just does the

19   Court find as a matter of fact that the co-conspirator,

20   Mr. Litteral, was in possession of both the weapon and the --

21   and the --

22          THE COURT:  Yes.

23          MR. SAVAGE:  -- and the magazine?

24          THE COURT:  The short answer is yes.

25          MR. SAVAGE:  Thank you.

1        THE COURT:  I think it's an undisputed purchase at
2    Gander Mountain as long as he was possessing -- from what we
3    know, possessing the box.
4        MR. SAVAGE:  Yes, sir.
5        THE COURT:  That the clip and the weapon were in
6    close proximity inside the box.
7        MR. SAVAGE:  Thank you, Your Honor.
8        THE COURT:  So, yes, that's a finding that the
9    Government has presented evidence sufficient by the
10   preponderance of the evidence for that finding of fact.
11       All right.  There's no other objections, correct?
12       MR. BEAM:  That is correct, Your Honor.
13       THE COURT:  All right.  So based on the Court's
14   rulings and the presentence report, the Court will now
15   calculate the advisory guidelines.
16       The guidelines provide -- and this is before
17   consideration of any motion by the United States.  The
18   guidelines provide for an offense level of 19, a criminal
19   history category I, for a guideline range of 30 to 37 months.
20       Do the parties agree those are the appropriate
21   advisory guidelines based on this Court's rulings as well as
22   the presentence report before consideration of any motion by
23   the United States?
24       MR. SAVAGE:  Yes, Your Honor.
25       MR. BEAM:  Yes, sir.

1          THE COURT:  Thank you.

2          Now, defendant -- excuse me.  The Government has

3    filed a motion.  It's under seal.  The Court has read the

4    motion.  I'll allow Mr. Savage to elaborate on the motion if

5    he'd like.

6          MR. SAVAGE:  Your Honor, as the Court knows, in

7    this particular case the Government had a pretty good case

8    going into this -- this matter.  We had --

9          THE COURT:  Right.

10         MR. SAVAGE:  -- electronic surveillance.  We had a

11   lot of -- a lot of information, but I think that it was made

12   immensely easier when Mr. Barker, who was one of the first

13   persons to enter a plea of guilty, both admitted to what he

14   did.  To Mr. Barker's credit, I think he tried to -- he tried

15   to protect his friend at least initially during the

16   interviews.  And by the way, Your Honor, in this case the FBI

17   recorded the interviews pursuant to its new policy.

18         THE COURT:  This is the first -- this is the first

19   case I've heard that happen.

20         MR. SAVAGE:  Okay.  And certainly those are

21   available to the Court if you wish to see them.

22         But I would note that once Mr. Barker came to grips

23   with Mr. Litteral and what he had done, I think he was

24   completely clean.  It was important -- I think you could

25   almost see in the tape the relief on Mr. Barker's face where

1    he just simply said, I'm addicted.  I'm addicted to these
2    pills.  It was the OxyContin and the Hydrocodone.  And I
3    think that had a great deal of influence in the fact that
4    Mr. Barker who is, you know, trying to live a life, already
5    has a conviction from a long time ago, trying to do a good
6    job, and then he has Mr. Litteral, who I think is literally
7    nagging him for things like pipes and pipe ends and trying to
8    get him involved in this whole business about anti-government
9    conspiracy and Mr. Obama is going to come and take their
10   guns, and Jake Helms is a subterfuge for the NATO takeover in
11   the country.  All of these things, which we would agree are
12   ridiculous theories, I think were very much an important part
13   in Mr. Litteral's life.  He tried to voice them on
14   Mr. Barker, who at the time was coping with a drug addiction
15   and also trying to make a living and trying to learn right
16   from -- to do the right thing.
17           So for those reasons, I think it was very hard for
18   Mr. Barker to come across; but once he did, he did so
19   completely, honestly, readily.  He didn't spare himself.  I
20   think he could have said a lot of things that would have
21   protected himself, but I think he put himself out there as
22   well as other defendants in this case.  He was quite clear
23   with the third defendant that he didn't know a lot about it.
24   He didn't try and make things up.  He didn't reach.
25           For those reasons, we think that -- we usually -- I

can't say that we have a hard-fast rule, but we think
30 percent -- he didn't testify -- is a generous and
appropriate departure.

That said, Your Honor, we still think there should
still be some punishment in this case.  It's a serious
offense.  We think if the Court went to an offense level 16
and imposed a sentence within that guideline, that that would
reward I think cooperation, encourage cooperation by other
people similarly situated, which Your Honor knows is very
important to the business we do.  But also, when we get to
the 3553(a) factors, also count for the severity of the
offense and the characteristics of this defendant.

THE COURT:  All right.  Thank you.  As the Court
said, it will grant the motion under 5K1.1 and it will
reserve ruling on the extent of the departure until it's
heard from both counsel.

Mr. Beam.

MR. BEAM:  Yes, sir.  Mr. Savage's summation of
what Mr. Barker did is a fair summation, Your Honor, but I
want to go further than that.  Mr. Barker what I'm admitting
was someone coming off of the use of the opiates.  I'm sure
the Court is aware of the physical and mental issues that are
given to someone who experiences this when they're coming off
of the use of those items.

THE COURT:  Right.

1          MR. BEAM:  And that's been noted several times by

2     the agents who when they came to interview Mr. Barker, they

3     literally looked at me said it's like looking at a different

4     person.

5          THE COURT:  Uhm-hum.

6          MR. BEAM:  Mr. Barker is someone who is an

7     intelligent gentleman.  Clearly, you can see from the

8     information in the presentence report, yes, he has the

9     conviction from a long time ago, but since then he conformed

10    his life.

11         THE COURT:  Right.

12         MR. BEAM:  Had a good job, had a daughter that he

13    was supporting.  Until he got into this situation that many

14    people go through, he ended up in a domestic situation that

15    resulted in his divorce.  And when people go through that

16    situation, many of them deal with it in different ways.

17    There's probably some depression that results from that, the

18    loss of the normalcy as well as just many people go through a

19    period of depression.  Some turn to counseling.  Some turn to

20    serious workouts at gyms.  Unfortunately, Mr. Barker chose to

21    take the opiates, and I have a feeling I'll tell the Court

22    that's the reason he's here.  I suspect he would not have

23    made the stupid decisions that ended him up here other than

24    he found himself in that predicament.

25         I know for a fact he told the agents, you know,

1    once he got in the position of using the opiates, he wanted

2    to do anything he could to help his supplier, but he didn't

3    go too far. I think the Government would agree that where

4    Mr. Litteral was trying to get him to provide certain items

5    for the pipe bomb, he purposely provided them because it

6    wouldn't work. He wanted to make sure his supply was still

7    in order, but he did not. He had got to a point where he was

8    getting involved in that.

9         Someone who once he started to -- once the opiates

10    started to clear out of his system, someone who understood

11    the position he was in, wanted to make amends, which he's

12    done as much as he possibly could.

13         And I will tell the Court we spoke several times

14    about, you know, whether he wishes to have a hearing to

15    determine whether he could get on pretrial release. My

16    client literally looked at me and said, No, I'm here. I just

17    want to do my time. I want to get it over with.

18         He's someone who has fully accepted the

19    responsibility. Someone who is capable of returning to

20    society in a meaningful manner. Quite frankly, we're hopeful

21    that he'll be able to get the same job or a job with the same

22    company once he is released. I think it's safe to say he was

23    a valuable employee. Once he got in the position he was in,

24    they terminated him, obviously.

25         THE COURT: Right.

1    MR. BEAM:  Based on some of the information that
2  I've gathered, there is a likelihood that he -- they'll hire
3  him back because he has some fairly specialized knowledge
4  that apparently he does a good job at.

5    He spent approximately five and a half months in
6  the Mecklenburg County Jail, and I think it's safe to say
7  that Mr. Barker has spent a great deal of time thinking about
8  his position, thinking about how he ended up here and
9  understanding what he's going to need to do once he is
10  released.

11    I understand the Government's recommendation.  We
12  appreciate the recommendation, but we're going to ask the
13  Court to do more than that.  We're going to ask the Court to
14  impose a sentence of 18 months, but that being at level 13 as
15  a nine-month active split with nine months of house arrest.
16  I think given when you look at Mr. Barker's overall body of
17  work, that addresses all the factors in 18 U.S.C. 3553(a),
18  protects society.  It is not saying that this is a trivial
19  matter.  Mr. Barker understands it was not, but it does
20  protect society, encourages people to help the Government,
21  and deals with all the other factors in a reasonable manner.

22    THE COURT:  So you're asking to depart not down to
23  the 16 but down to 13?

24    MR. BEAM:  Correct.  For the split sentence it has
25  to be down to 13.

1          THE COURT:  Right.

2          MR. BEAM:  I believe that's the highest level

3    someone can get a split sentence in.

4          THE COURT:  Right.  That's the Zone 3 -- excuse me.

5    Zone C, not Zone 3.

6          MR. BEAM:  Zone C, yes, sir.

7          THE COURT:  All right.  Thank you.

8          MR. BEAM:  Thank you.

9          THE COURT:  Mr. Barker, you have the right to

10   address the Court if you so choose.

11         THE DEFENDANT:  I do.  Your Honor, to be honest, I

12   had a speech that I had planned, but between Mr. Savage and

13   Mr. Beam, I think they've covered about 75 percent of it.

14         I just wanted to address the Court and say that

15   since I've been incarcerated, I definitely had a lot of time

16   to reflect on everything that's taken place, and I think most

17   of my bad decisions were rooted in my addiction or dependence

18   to the prescription pain medication.

19         There's a couple of things good that has happened

20   to me since I've been in here.  One of them I definitely got

21   my mind and my body.  I'm thinking clearly for the first time

22   in about two years.  So I've also noticed that I've had a

23   tremendous family support network that I should have been

24   leaning on that I can lean on now, but, you know, I should

25   have been leaning on before all this had taken place.

1          So I definitely wouldn't consider myself a repeat

2     offender, and I'm truly remorseful for everything that's

3     happened.

4          THE COURT:  All right.  Thank you very much, sir.

5          THE DEFENDANT:  You're welcome.

6          THE COURT:  Mr. Savage.

7          MR. SAVAGE:  Your Honor, I stand by everything we

8     said; however, I think that the Court has to look at the

9     nature and history of these -- has to look at the seriousness

10    of this offense.  And all you have to do to look at the

11    seriousness of the offense is to look at this weapon.  It's

12    not a deer rifle.  It's not a shotgun.  It shoots 30 rounds

13    with the press of a finger.  It had two clips that could have

14    been used with it.  It's a serious thing.  And it was going

15    to be used because we know that because the defendant bought

16    100 rounds of ammunition with it.

17         Now, I think, Your Honor, that given all of that,

18    we hear a lot today about why doesn't -- why doesn't the

19    Government enforce the laws that are under the Court?  Well,

20    this is where we are.  This is where the rubber meets the

21    road.  There has to be both a specific and general

22    deterrence.

23         We understand there are mitigating factors in this

24    case, but without an active prison sentence, Mr. Barker has

25    to ask himself:  Am I going to be more afraid of being back

here in the future, or am I going to be more afraid of
offending Mr. Barker -- or Mr. Litteral or some other
defendant?  What else when some other stress comes up in his
life is he going to be able to say, "I'm going to do right
thing because I don't want to be here"?  For that, it
requires a just punishment for this offense.

Then there's the issue of general deterrence.  Not
that the Court should issue a sentence based on general
deterrence, but anyone else that wants to look at these
circumstances, anybody else who wants to get involved in an
anti-government cause, anybody that wants to get involved
with prescription drugs should know if they do so and they
violate the law with a weapon like this, there will be
consequences and they will be severe.

So for those reasons, Your Honor, we think that a
level 16 is just about right.  It's not too much and it is
not too little.  It's just about right.

THE COURT:  Thank you.

The Court notes that the two counts of conviction
do not have identifiable victims.  The United States and
society as a whole are the victims of crimes such as
conspiracy to defraud the United States and possession of a
firearm by a prohibited person.  Therefore, the Justice for
All Act and the Mandatory Victim Restitution Act do not
apply.

1          I'm presuming there's a forfeiture in this case
2    because of the Government's possessing the AR-15.  Or is that
3    not happening?
4          MR. SAVAGE:  Your Honor, that, actually we received
5    pursuant to a grand jury subpoena from Gander Mountain, and
6    we're going to ask for permission to return that at the
7    conclusion of Mr. Litteral's --
8          THE COURT:  So that wasn't the actual?
9          MR. SAVAGE:  No, it is the actual gun, but Gander
10   Mountain possessed it pending the paperwork.
11         THE COURT:  Oh, I see.
12         MR. SAVAGE:  Okay?  So this is the actual gun.
13   Before they could sell it to somebody else, we would have --
14         THE COURT:  I understand.  So that will obviously
15   not be forfeited.  It will be returned.
16         MR. SAVAGE:  It will be returned to its owner.
17   There were items that were seized, which would include the
18   clip.  The various items that are there are simply the items
19   seized that are prohibited contraband.  I think we returned
20   everything else.
21         THE COURT:  All right.  So there's no forfeiture as
22   to Mr. Barker?
23         MR. SAVAGE:  There was some items that the Court
24   could note.
25         THE COURT:  There was a forfeiture order?

1          MR. SAVAGE:  Yes, Your Honor.

2          THE DEPUTY CLERK:  No. 41.

3          THE COURT:  No. 41.

4          MR. SAVAGE:  Yes, sir.

5          THE COURT:  That's been filed that the Court

6    reviewed.

7          MR. SAVAGE:  Yes, Your Honor.

8          THE COURT:  Yeah.  Okay.

9          Mr. Barker, there's a three-step process this Court

10   must go through in determining the appropriate and reasonable

11   sentence in your case.  This three-step process is set forth

12   in a series of Supreme Court decisions, starting with *United*

13   *States v. Booker*.

14          The first step in the process, the Court is

15   required to calculate the advisory guideline range.  As you

16   are aware, at the beginning of this hearing the Court did

17   determine your guideline range to be 30 to 37 months.  That

18   is just advisory.  The Court's not bound by that range, but

19   the Court must calculate it as the starting point for the

20   appropriate sentence in your case.

21          The second step in the process, the Court is to

22   consider all the bases for departures that are set forth in

23   the policy statements of the U.S. Sentencing Guidelines

24   Manual.  I'm holding a copy of the manual up.  The vast

25   majority of those departures the Court determines whether

departure should be made or not. There is, though, the
exception as 5K1.1. The Government determines if you're
entitled to a departure in that case; that is, provided
substantial assistance to the United States.

In this case, as you're aware, the Government has
made the motion to depart pursuant to 5K1.1, and the Court
granted that motion a few moments ago, but now the Court has
to rule on that departure.

The Government has recommended a departure from
offense level 19 to offense level 16. Mr. Beam, your
counsel, has recommended a departure from offense level 19 to
offense level 13. In ruling on a substantial assistance
departure, what drives the Court in determining the
appropriate departure is your substantial assistance, the
extent of your substantial assistance, the risk you take in
providing substantial assistance, the advancement of
investigations that your substantial assistance provides, all
of those things that further the Government's mission of
combating criminal activity, and specifically where it can
help in the ongoing investigation.

I've heard from both counsel. There's no
scientific or rigid mathematical formula in determining what
is an appropriate departure. But in this district, or at
least the custom by this Court, the Court hears argument from
both parties as to the extent of your substantial assistance.

1    Generally, the most this Court gives as a departure in those
2    rare cases where the assistance was extraordinary, such as
3    putting yourself at risk by doing undercover operations or
4    testifying in a courtroom, things like that, you know, the
5    Court usually doesn't give more than a 50 percent departure
6    from the low end of the guideline range.  The more -- in more
7    cases, there's a departure, such as the one in this case,
8    where the Government is recommending what they say is a
9    30 percent departure.  That's 30 percent down from the low
10   end of the original range.  That seems to be the applicable
11   level of substantial assistance in your case from hearing
12   arguments from both counsel.  That would be the three-level
13   departure the Government recommends down to offense level 16,
14   criminal history category I, for a range of 21 to 27 months.

15        Your counsel's argument of a six-level departure
16   down to an 18-month sentence, that would be a split sentence
17   under Zone C of the sentencing table, in this Court's opinion
18   seems to be a greater departure than your level of
19   substantial assistance.

20        I will also address this in the context of a
21   variance in a moment.  But as to substantial assistance, I
22   believe the Government's recommendation seems to be
23   appropriate.  Therefore, as the Court said a moment ago, it
24   will depart three levels to offense level 16, criminal
25   history category I, range of 21 to 27 months.

1    Now, the third step in the sentencing process, the

2 Court is to consider a series of sentencing factors that were

3 enacted by Congress to guide courts in fashioning sentences

4 that are sufficient, but not greater than necessary, to

5 accomplish the goals of sentencing.  The Court has considered

6 all those sentencing factors and wants to highlight some that

7 are particularly important in your case.

8    One is the nature and circumstances of the offense.

9 You were involved in a very unusual conspiracy.  As

10 Mr. Savage has called, an "anti-government conspiracy."

11    We certainly have incredible rights in this country

12 where we can vocally disagree with our leadership, our

13 elected leaders, our appointed leaders, but one thing we

14 can't do is cross the line and use the threat of force or

15 actually use force to exercise our political beliefs, and

16 that's what you co-conspired to do.  But I do agree with both

17 counsel, you were under the influence of prescription drugs,

18 puts you somewhat in a fog.  The Court does believe you

19 consciously knew what you were doing, you did understand

20 right from wrong, but you were in such a state that you were

21 manipulated by your co-conspirator, and I think that's very

22 relevant in considering the sentence in your case.

23    But nonetheless, the nature and circumstances of

24 the offense and the seriousness of the offense are severe.

25 You were involved in an anti-government conspiracy, and it's

something that the Court doesn't believe is the appropriate way to show your displeasure with the leadership of the United States.

The Court also wants to look at deterrence. That was something that Mr. Savage emphasized. This Court does not believe you're doing to be a threat in the future. I think you're very remorseful. You said that a moment ago. You said you're not going to be a repeat offender, and I believe you. So I don't think there's any need to specifically deter you, but I do agree that general deterrence is very important.

General deterrence is very critical in your case not because you possessed a firearm when you had a prior conviction. That is certainly something that prohibits you from possessing a firearm. But as there's a lot of public debate going on right now about the enforcement of firearms laws and that wrong people getting firearms, but there's not enough meaningful discussion about who the wrong people are. However, if you read Section 922(g) of Title 18, U.S. Code, there's a list of them, and we frequently talk about convicted felons possessing firearms or ammunition, but we rarely talk about another prohibited person, and that is a drug abuser. If you're addicted to drugs, whether you've been convicted of a felony or not, you are not to possess a firearm. And in a time we're concerned about people who have

1   mental illness and drug addictions possessing and using

2   firearms in the worst possible way.

3        It's very important to this Court to send a message

4   that if you are a drug abuser, you are legally dispossessed

5   of the constitutional right of possessing a firearm because

6   you've gone through -- because you've put yourself in that

7   position of not being trustworthy.  And so general deterrence

8   is very important in this case, and that is why the Court

9   believes the very short sentence of active time of only nine

10   months recommended by your counsel wouldn't be appropriate as

11   a variance either.

12        The Court is concerned about your rehabilitation.

13   I think you've come a long way in dealing with your

14   addiction.  I think that's fantastic.  I'm going to recommend

15   that you continue on with substance abuse treatment.  I'm

16   certainly going to recommend it to the Bureau of Prisons, but

17   I'm also going to impose it as a condition of your

18   supervision while you're on supervised release.

19        Now, I did just want to add that your history and

20   characteristics do remind this Court of the fact that you've

21   had a drug addiction.  While that doesn't at all excuse you

22   from criminal conduct, it also shows this Court that the drug

23   addiction somewhat played into, as I've already said, into

24   your agreement with Mr. Litteral to enter into a conspiracy

25   against the United States of America.

1    So the Court has considered all the sentencing

2 factors at Section 3553(a).  The Court has highlighted

3 several sentencing factors that it believes are particularly

4 important in this case.  Through the consideration of the

5 sentencing factors, the Court, as it's articulated, has

6 concluded that a sentence at the low end of the guideline

7 range based on the departed range is appropriate in this

8 case.  A further variance would not be appropriate.

9    With that said, the Court will now state a sentence

10 that it believes is sufficient, but not greater than

11 necessary, to accomplish the goals of sentencing.

12    One moment.

13    (Pause.)

14    THE COURT:  The Court proposes the following

15 sentence:

16    Pursuant to the Sentencing Reform Act of 1984 and

17 *United States v. Booker*, it's the judgment of the Court,

18 having considered the factors noted in 18 U.S.C. Section

19 3553(a), that defendant, Christopher James Barker, is hereby

20 committed to the custody of the United States Bureau of

21 Prisons to be in prison for a term of 21 months on each count

22 to be served concurrently.

23    The Court further recommends that the defendant be

24 allowed to participate in any educational and vocational

25 opportunities while incarcerated.

1    The Court calls the attention of the custodial

2  authorities that the defendant has a history of substance

3  abuse and recommends the defendant be allowed to participate

4  in any available substance abuse treatment programs while

5  incarcerated and if eligible receive benefit of Title 18,

6  U.S. Code, Section 3621(e)(2).

7    Upon release from imprisonment, defendant shall be

8  placed on supervised release for a term of two years.  This

9  term consists of terms of two years on each of Counts One and

10  Two.  All such terms to run concurrently.

11    Within 72 hours of release from the custody of the

12  Bureau of Prisons, defendant shall report in person to the

13  probation office in the district to which the defendant is

14  released.

15    While on supervised release, the defendant shall

16  not commit another federal, state, or local crime, and shall

17  comply with the standard conditions that have been adopted by

18  the Court in the Western District of North Carolina.

19    It's further ordered defendant shall pay the United

20  States a special assessment of $200.

21    The Court finds the defendant does not have the

22  ability to pay a fine or interest.  The Court, having

23  considered the factors noted in 18 U.S.C. Section 3572(a),

24  will waive payment of a fine and interest in this case.

25    The defendant shall forfeit defendant's interests

1    in any properties identified by the United States.  The Court

2    incorporates by reference Document No. 41 in the Electronic

3    Case File, which is a consent judgment of forfeiture.

4              Payment of the criminal monetary penalties shall be

5    due and payable immediately.

6              The Court has considered the financial and other

7    information contained in the presentence report and finds the

8    following is feasible:  If the defendant is unable to pay any

9    monetary penalty immediately, during the period of

10   imprisonment, payment shall be made through the Federal

11   Bureau of Prison's Inmate Financial Responsibility Program.

12   Upon release from imprisonment any remaining balance shall be

13   paid in monthly installments of no less than $50 to commence

14   within 60 days until paid in full.

15             Throughout the period of supervision the probation

16   officer shall monitor defendant's economic circumstances and

17   shall report to the Court with recommendations, as warranted,

18   any material changes that affect the defendant's ability to

19   pay any court ordered penalties.

20             Mr. Beam, place of designation?

21             MR. BEAM:  As close to Charlotte as possible.

22   Gastonia.  As close to Gastonia as possible.

23             THE COURT:  All right.  The Court would recommend

24   to the Bureau of Prisons that the defendant be designated as

25   close to Gastonia, North Carolina, as possible.

1          Now, I ask counsel is there's any legal reason why
2     the sentence should not be imposed as stated?
3          MR. SAVAGE:  No, sir.
4          MR. BEAM:  No, sir.
5          THE COURT:  All right.  Thank you.
6          (The Court and probation conferred off the record.)
7          THE COURT:  The probation officer is reminding me
8     that I meant to have as a condition of his supervision that
9     the defendant be placed on substance abuse treatment at the
10    direction of the U.S. probation officer.
11         Thank you very much.
12         All right.  This is a bill of information, correct?
13         MR. SAVAGE:  Yes, Your Honor.
14         THE COURT:  There's no counts to be dismissed.
15         All right.  Mr. Barker, in exchange for benefits
16    you receive for entering into the plea of guilty with the
17    United States, you've waived your right to contest your
18    conviction and sentence either on direct appeal or in a
19    separate civil action sometimes referred to a habeas corpus
20    motion or a 2255.  However, you have preserved your right to
21    appeal claims of ineffective assistance of counsel and claims
22    of prosecutorial misconduct.
23         Do you understand this limitation on your right of
24    appeal?
25         THE DEFENDANT:  Yes, sir.

1          THE COURT:  All right.  Now, if you do choose to
2     appeal, any notice of appeal must be filed within 14 calendar
3     days from the date of written judgment.  This Court usually
4     hands down the written judgment one to two weeks after this
5     sentencing hearing.  If you're unable to pay the cost of an
6     appeal, you may apply for leave to appeal at no cost to you.
7     If you so request, the Clerk of Court will prepare and file a
8     notice of appeal on your behalf.  The Court recommends you
9     talk to Mr. Beam about these appeal rights and procedures.
10          Do you understand these appeal rights and
11     procedures as the Court has stated them to you today?
12          THE DEFENDANT:  I do.
13          THE COURT:  All right.  So you are currently in the
14     custody of the U.S. Marshal Service.  You will be transferred
15     to the U.S. Bureau of Prisons for service of your sentence.
16     That process takes anywhere from two weeks to two months.
17          Do you have any questions for the Court?
18          THE DEFENDANT:  No, sir, I do not.
19          THE COURT:  Anything else from counsel?
20          MR. SAVAGE:  Your Honor, we request permission to
21     substitute the photographs for the record of Government's
22     Exhibit 1.
23          THE COURT:  Yes.  Granted.  So the property, the
24     AR-15 can be returned to Gander Mountain.
25          Anything else, Mr. Beam?

1        MR. BEAM:  No, sir.

2        THE COURT:  All right.  Then the sentence as

3 proposed is hereby ordered imposed.

4        Good luck, sir.

5        (The proceedings concluded at 3:00 p.m.)

6                    *    *    *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CLR, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 4th day of March 2016.


/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CLR
U.S. Official Court Reporter